## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02869

CENTER FOR BIOLOGICAL DIVERSITY,

THE WILDERNESS SOCIETY, and

WILDERNESS WORKSHOP,

      Plaintiffs,

vs.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U. S. Department of the Interior,

DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of the Interior,

WILLIAM PERRY PENDLEY, in his official capacity as Acting Director of the Bureau of Land Management,

MICHAEL NEDD, in his official capacity as Deputy Director of the U.S. Bureau of Land Management,

JAMIE CONNELL, in her official capacity as Colorado State Director of the U.S. Bureau of Land Management, and

WAYNE WERKMEISTER, in his official capacity as Acting Field Manager of the Grand Junction Field Office of the U.S. Bureau of Land Management,

      Federal Defendants.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

## INTRODUCTION

1.      This petition challenges the federal defendants' approval of a resource management plan in western Colorado, thereby making available for oil and gas leasing and development over a million acres, without properly analyzing, studying alternatives to, and disclosing to the public significant quantities of greenhouse gas emissions and ensuing impacts to our climate, natural resources, and communities. It asks this Court to set aside that approval as violating the National Environmental Policy Act ("NEPA") and to ensure that federal management of oil and gas leasing and development in this area awaits the federal defendants' compliance with the law.

2.      Plaintiffs Center for Biological Diversity, The Wilderness Society, and Wilderness Workshop (collectively "Citizen Groups") challenge the decision of the U.S. Bureau of Land Management ("BLM"), and David Bernhardt, William Perry Pendley, Michael Nedd, Jamie Connell, and Wayne Werkmeister in their official capacities (collectively, "Federal Defendants"), to approve through a Record of Decision ("ROD") on August 24, 2015 the Grand Junction Field Office ("GJFO" or "Field Office") Resource Management Plan ("RMP") and Final Environmental Impact Statement ("Grand Junction EIS," or, simply, "EIS"). BLM's approval of the RMP violated NEPA, 42 U.S.C. §§ 4321 *et seq.,* and its implementing regulations and policies.

3.      The RMP applies to 1,061,400 acres of BLM-administered surface land in western Colorado and 1,231,200 acres of BLM managed federal mineral estate, much of it underlying the BLM surface estate. These areas are interspersed with other ownerships within

the 2.9 million-acre GJFO administrative boundary. The planning area includes lands in Garfield, Mesa, Montrose, and Rio Blanco Counties.

4.     The Grand Junction planning area is home to some of the nation's most important natural resources. It includes the Colorado River, known as the lifeblood of the Southwest, which provides water to forty million people. It is rich in wildlife, including elk, mule deer, bighorn sheep, sage grouse, and pronghorn, as well as genetically-pure populations of Colorado River cutthroat trout. And it includes river segments that are eligible for protection under the Wild and Scenic Rivers Act, as well as four Wilderness Study Areas comprising nearly 100,000 acres. The planning area includes communities reliant on ranching, orchards, vineyards, and organic farming, as well as on tourism associated with recreational opportunities offered by public lands. The planning area also overlies much of the Piceance Basin—a significant natural gas reservoir.

5.     Through its approval of the Grand Junction RMP, BLM made available 935,600 acres for oil and gas leasing. Based on the Reasonable Foreseeable Development Scenario ("RFDS"), BLM projects 3,940 wells will be drilled and associated facilities and infrastructure will be developed.

6.     The United States is the world's largest producer of oil and gas. Spurred by advances in extractive technologies, industry intends for oil and gas to remain a prominent source of energy for some years to come. At the same time, as previously observed by President Obama, America is "transitioning away from energy that creates the carbon that's warming the planet and threatening our health and our environment." The reduction of emissions from the oil and gas sector has become a central component of national and global efforts to address the climate crisis.

7.       In 2013, the Federal government released a federal Climate Action Plan, later setting the goal of cutting methane emissions from the oil and gas sector by 40-45 percent from 2012 levels by 2025. The first step in these efforts was made in 2015 when the Environmental Protection Agency ("EPA") proposed measures to cut methane and volatile organic compound ("VOC") emissions from the oil and natural gas industry to "help combat climate change, reduce air pollution that harms public health, and provide greater certainty about Clean Air Act permitting requirements for the oil and natural gas industry." In 2016, the U.S. Department of the Interior and BLM followed suit with a proposal to "update 30 year-old regulations in order to reduce the wasteful release of natural gas into the atmosphere from oil and gas operations on public and American Indian lands. The proposed rule on venting, flaring and leaking will help curb waste of our nation's natural gas supplies, reduce harmful methane emissions and provide a fair return on public resources for federal taxpayers, Tribes, and States." In May 2016, the EPA finalized standards to cut methane emissions from new and existing sources in the oil and gas sector, which the Administration described as a "further step…to take action on climate change and protect public health."

8.       These national efforts to reduce oil and gas sector emissions came within the global context of the United Nations Framework Convention on Climate Change, Conference of Parties' "Adoption of the Paris Agreement" on December 12, 2015, in which official representatives of 196 nations, including the United States, agreed to a take and increase concrete measures to abate climate change by reducing global greenhouse gas ("GHG") emissions and, among other things, "pursue efforts to limit the [average global] temperature increase to 1.5°C above pre-industrial levels, recognizing that this would significantly reduce the risks and impacts of climate change."

**9.** In June 2017, President Trump announced that the U.S. would withdraw from the Paris Agreement. Despite this announcement, the U.S. is still bound by the Paris Agreement until at least November 4, 2020, the earliest possible withdrawal date under Article 28 of the Paris Agreement. President Trump has also taken steps to dismantle the Obama-era Climate Action Plan and many other climate policy advances made during that administration. Nevertheless, support for aggressive climate action remains at the state, city, and local level, as well internationally.

**10.** In spite of broad recognition, both at home and abroad, of the need to move aggressively on a path towards a clean energy future and a healthy environment, BLM is failing to acknowledge the full impact of its decisions to authorize and facilitate the leasing and development of our public lands for fossil fuels, including oil and gas in the Grand Junction planning area.

**11.** BLM, in the Grand Junction EIS: (1) failed to consider any alternatives that would meaningfully limit oil and gas leasing and development within the planning area and safeguard other multiple use values; (2) failed to quantify or analyze indirect (combustion) and cumulative emissions caused by oil and gas production under the RMP, including in combination with emissions from the public lands oil and gas program as a whole.

**12.** Because BLM failed to analyze these factors adequately in its NEPA documents and approved the Grand Junction RMP without sufficient analysis, the Citizen Groups bring this civil action.

## JURISDICTION AND VENUE

**13.** This action arises under NEPA, 42 U.S.C. §§ 4321-4370h.

**14.**     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action raises a federal question. The Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

**15.**     This action reflects an actual, present, and justiciable controversy between Citizen Groups and Federal Defendants. Citizen Groups' interests are adversely affected and irreparably injured by Federal Defendants' violations of NEPA as alleged herein, and will be further adversely affected and irreparably injured if BLM affirmatively implements the decision that Citizen Groups challenge herein. These injuries are concrete and particularized and fairly traceable to Federal Defendants' challenged decision, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

**16.**     The requested relief would redress the actual and imminent, concrete injuries to Citizen Groups caused by BLM's failure to comply with duties mandated by NEPA and its implementing regulations.

**17.**     The challenged agency action is final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

**18.**     Citizen Groups have exhausted any and all available and required administrative remedies.

**19.**     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the property that is the subject of the action—the planning area administered by the BLM's Grand Junction Field Office—is located in Colorado. Venue is also proper under 28 U.S.C. § 1391(e)(1) because officers of the United States in Colorado are defendants, a substantial part of the events and omissions giving rise to this case occurred in BLM offices located in Colorado,

Plaintiff Wilderness Workshop resides in Colorado, and Plaintiffs Center for Biological

Diversity and The Wilderness Society maintain offices in Colorado.

## PARTIES

20.     Plaintiff Wilderness Workshop is a non-profit organization dedicated to

preservation and conservation of the wilderness and natural resources of the White River

National Forest and adjacent public lands, including in the Grand Junction Field Office planning

area. Wilderness Workshop engages in research, education, legal advocacy, and grassroots

organizing to protect the ecological integrity of local landscapes and public lands in the area

affected by the RMP. Wilderness Workshop focuses on the monitoring and conservation of air

and water quality, wildlife species and habitat, natural communities, and lands of wilderness

quality. Wilderness Workshop is the oldest environmental non-profit in the Roaring Fork Valley,

dating back to 1967, with a membership base of more than 700 people. Many of its members

live, work, recreate, and/or otherwise use and enjoy lands affected by the RMP. They have an

interest in the protection and enhancement of natural values in the planning area. Wilderness

Workshop brings this action on its own behalf and on behalf of its adversely affected members.

21.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit

environmental organization with over 67,000 members, including 2,444 in Colorado.  The Center

maintains an office in Denver, Colorado and employs six staff based in Colorado.  The Center

uses science, policy and law to advocate for the conservation and recovery of species on the

brink of extinction and the habitats they need to survive.  The Center has and continues to

advocate for increased protections for Colorado species and their habitats, a livable climate and

healthy communities by engaging at every step of federal fossil fuel planning, leasing and

development.

22.     Plaintiff The Wilderness Society ("TWS") has a mission to protect wilderness and inspire Americans to care for our wild places. TWS is one of America's leading public lands conservation organizations. Since 1935, TWS has been dedicated to protecting America's wild places for current and future generations. We are committed to smart and sensible regulation and management of our public lands and work to ensure that public resources are used effectively, efficiently, and responsibly. TWS supports a transition to renewable energy, including by ensuring that oil and gas and other energy development is focused in suitable locations and completed in a manner that does not harm other values. TWS engages frequently in BLM land use planning and project proposals, including the Grand Junction RMP at issue here where we commented on the draft Environmental Impact Statement for the RMP and  filed a protest of the approved RMP. TWS has offices throughout the country, including an office with 20 employees in Denver, Colorado and another office in Steamboat Springs, Colorado. TWS has 6,051 members in Colorado and over one million members and supporters nationwide.

23.     Citizen Groups and their members have concrete and particularized interests in the public lands and minerals managed by BLM through the Grand Junction RMP.

24.     Citizen Groups' and many of their members' interests are deeply rooted in the communities of the American West where Citizen Groups and their members reside, work, and recreate. These interests are also bound to the land, wildlands, air, rivers, streams, habitat, wildlife, and other components of healthy, intact landscapes in the Grand Junction planning area—all of which are threatened by human-caused climate change, and other impacts associated with oil and gas development. Citizen Groups and their members use and enjoy these landscapes for hiking, hunting, camping, photography, aesthetic enjoyment, spiritual contemplation, ranching, and other vocational, scientific, and recreational activities. Some of Citizen Groups'

members own surface lands overlying federal minerals that are subject to the Grand Junction RMP. Citizen Groups and their members intend to continue to use and enjoy BLM and other Grand Junction planning area lands, wildlands, wildlife habitat, rivers, streams, and healthy environments frequently and on an ongoing basis in the future, including this year.

25.     The aesthetic, recreational, scientific, educational, religious, and procedural interests of Citizen Groups and their members have been and will be adversely affected by the process in which BLM approved the Grand Junction RMP, and by BLM's resulting decision. The adverse impacts from BLM's process and decision threaten actual, imminent, concrete, and particularized harm to Citizen Groups and their members' interests that are redressable by remedies at law.

26.     The relief sought by Citizen Groups would help remedy the injuries suffered by the Citizen Groups and their members.

27.     Federal Defendant U.S. Bureau of Land Management is a federal agency within the U.S. Department of the Interior that is responsible for the management of more than 245 million acres of public lands in the United States and nearly 700 million acres of federal subsurface mineral estate.

28.     Federal Defendant David Bernhardt is sued in his official capacity as Acting Secretary of the U.S. Department of the Interior. As Acting Secretary, Mr. Bernhardt is responsible for managing public lands, resources, and mineral estates of the United States, including lands and resources in Colorado subject to the decision at issue herein, and, in that official capacity, is responsible for implementing and complying with federal law, including the legal requirements that form the basis of this action.

29.    Federal Defendant William Perry Pendley is sued in his official capacity as Acting Director of the U.S. Bureau of Land Management. As Acting Director, Mr. Pendley oversees the agency's management of public lands and is responsible for managing public lands under BLM authority, including lands and resources in Colorado subject to the decision at issue herein, in accordance with NEPA and other federal law.

30.    Federal Defendant Mike Nedd is sued in his official capacity as Deputy Director of the U.S. Bureau of Land Management. As Deputy Director, Mr. Nedd oversees the agency's management of public lands and is responsible for managing public lands under BLM authority, including lands and resources in Colorado subject to the decision at issue herein, in accordance with NEPA and other federal law.

31.    Federal Defendant Jamie Connell is sued in her official capacity as Colorado State Director of the U.S. Bureau of Land Management. Ms. Connell is responsible for managing public lands under BLM authority, including lands and resources in Colorado subject to the decision at issue herein, in accordance with NEPA and other federal law.

32.    Federal Defendant Wayne Werkmeister is sued in his official capacity as Acting Field Manager of the Grand Junction Field Office of the U.S. Bureau of Land Management. Mr. Werkmeister is responsible for managing public lands under BLM authority, including lands and resources in the Grand Junction Field Office administrative area subject to the decision at issue herein, in accordance with NEPA and other federal law. Mr. Werkmeister's predecessor signed the Record of Decision at issue in this case.

## STATUTORY BACKGROUND

I.    **<u>National Environmental Policy Act</u>**

**33.**     NEPA is our "basic national charter for the protection of the environment." 40

C.F.R. § 1500.1. It is NEPA's purpose, in part, "to promote efforts which will prevent or

eliminate damage to the environment and biosphere and stimulate the health and welfare of

man." 42 U.S.C. § 4321. Recognizing that "each person should enjoy a healthful environment,"

NEPA directs that the federal government use all practicable means to "assure for all Americans

safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain

the widest range of beneficial uses of the environment without degradation, risk to health or

safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b).

**34.**     NEPA regulations explain that:

> Ultimately, of course, it is not better documents but better decisions that count.
> NEPA's purpose is not to generate paperwork—even excellent paperwork—but to
> foster excellent action. The NEPA process is intended to help public officials make
> decisions that are based on understanding of environmental consequences, and take
> actions that protect, restore, and enhance the environment.

40 C.F.R. § 1500.1(c).

**35.**     NEPA regulations direct that "Agencies shall integrate the NEPA process with

other planning at the earliest possible time to insure that planning and decisions reflect

environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.*

§ 1501.2.

**36.**     To accomplish this purpose, NEPA requires that federal agencies prepare a

"detailed statement" regarding all "major federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C). This environmental impact statement must,

among other things, describe the "environmental impact of the proposed action," and evaluate

"alternatives to the proposal." *Id.* § 4332(2)(C)(ii), (iii).

**37.**     NEPA also requires that every agency must "study, develop, and describe

alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E). The alternatives

evaluation "is the heart of the environmental impact statement," 40 C.F.R. § 1502.14, and must

present a hard look at the effects of proposed major federal actions and alternatives. These

effects include "ecological (such as the effects on natural resources and on the components,

structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social,

or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

 **38.** NEPA regulations also direct that BLM to the fullest extent possible "encourage

and facilitate public involvement" in the NEPA process. *Id.* § 1500.2(d).

**II.** **Federal Land Policy Management Act**

 **39.** The Federal Land Policy Management Act ("FLPMA") instructs the Secretary of

the Interior to "manage the public lands under principles of multiple use and sustained yield." 43

U.S.C. § 1732(a).

 **40.** "Multiple use" means "a combination of balanced and diverse resource uses that

takes into account the long-term needs of future generations for renewable and nonrenewable

resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife

and fish, and natural scenic, scientific and historical values." *Id.* § 1702(c).

 **41.** FLPMA also requires that:

[P]ublic lands be managed in a manner that will protect the quality of scientific,
scenic, historical, ecological, environmental, air and atmospheric, water resource,
and archeological values; that, where appropriate, will preserve and protect certain
public lands in their natural condition; that will provide food and habitat for fish
and wildlife and domestic animals; and that will provide for outdoor recreation and
human occupancy and use.

*Id.* § 1701(a)(8).

 **42.** BLM must "develop, maintain, and, when appropriate, revise land use plans

which provide by tracts or areas for the use of the public lands." *Id.* § 1712.

43.     BLM is also required to "take any action necessary to prevent unnecessary or undue degradation of the lands" and "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." *Id.* § 1732(b), (d)(2)(A).

## III.   Administrative Procedure Act

44.     The Administrative Procedure Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*

45.     Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action…found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)-(F).

## STATEMENT OF FACTS

## I.   Background of Planning Decision

46.     The Grand Junction RMP provides a framework to the Bureau of Land Management to manage 1,061,400 acres of public, federally-managed surface estate and 1,231,300 acres of public, federally-managed mineral estate in four Colorado counties: Mesa, Garfield, Rio Blanco, and Montrose.

47.     The Grand Junction Field Office planning area includes beautiful and diverse landscapes, including Wilderness Study Areas, renowned rivers and streams, and abundant wildlife. The area is also a well-known farming mecca, with many orchards, vineyards, and

organic farms. These treasures make the area a popular destination for year-round outdoor recreation and tourism.

48.　　The Grand Junction Field Office also overlaps the Piceance Basin, an area that has already experienced intensive oil and gas development. BLM recognizes in the EIS that leasing and development of oil and gas is in conflict with ecological and recreational values of the planning area.

49.　　It is a responsibility of BLM, through development of an RMP, to balance the use of public lands and minerals through its multiple use mandate, to prevent unnecessary and undue degradation, and to minimize adverse impacts on natural, environmental, scientific, cultural, and other resources and values.

50.　　The Grand Junction RMP acts as a blueprint for how the BLM will manage areas of public land and minerals over a 20-year time horizon. The RMP establishes goals and standards for future management actions, as well as making some implementation-level decisions, based in part on the analysis of the direct, indirect, and cumulative impacts of various alternatives in the RMP's corresponding EIS.

51.　　Here, the process of developing the RMP, as mandated by NEPA, began in 2008, and included a scoping period and comment periods on draft and final environmental impact statements. Citizens Groups participated extensively at all stages of development of the RMP and EIS.

52.　　The EIS for the Grand Junction RMP considered four alternatives: No Action (Alternative A); Mixed Use (Alternative B); Conservation (Alternative C); and Resource Use (Alternative D). BLM's Proposed Alternative in the Final EIS was Alternative B.

53.     BLM states that Alternatives A, B, and D are "essentially equivalent" with respect to the number of oil and gas wells that are forecasted to be drilled, while Alternative C would reduce the number of oil and gas wells forecasted to be drilled by about 9%.

54.     The Reasonably Foreseeable Development Scenario projects approximately 4,000 new wells will be drilled during the 20-year planning period.

55.     Citizen Groups timely filed public comments on the BLM's draft EIS for the RMP. Citizen Groups subsequently filed Protests with BLM for the proposed RMP and final EIS. On August 10, 2015, BLM denied the Citizen Groups' Protests. On August 24, 2015, BLM issued a ROD approving both the final EIS and Alternative B, with minor changes and clarifications, as the final Approved RMP for the Grand Junction planning area.

II.     **Background on Climate Change**

56.     Climate change is well-established as a real and significant threat to the planet and its inhabitants. The Intergovernmental Panel on Climate Change ("IPCC"), in its Fifth Assessment Report, stated that "human influence on the climate system is clear and growing, with impacts observed across all continents and oceans…the more human activities disrupt the climate, the greater the risks of severe, pervasive and irreversible impacts for people and ecosystems, and long-lasting changes in all components of the climate system." The IPCC continued: "we have the means to limit climate change and its risks, with many solutions that allow for continued economic and human development. However, stabilizing temperature increase to below [2 degrees Celsius] relative to pre-industrial levels will require an urgent and fundamental departure from business as usual. Moreover, the longer we wait to take action, the more it will cost and the greater the technological, economic, social and institutional challenges we will face."

57.     As of 2017, the Earth had warmed by an average of about 1 degree Celsius (1.8 degrees Fahrenheit) since the late 19th century. Evidence shows that recent global warming is primarily a result of greenhouse gas ("GHG") emissions generated from human activities.

58.     This warming is already leading to serious consequences, including reductions in crop yields, increases in rainfall and flooding, increases in hurricanes and typhoons, decreases in snowpack and stream flows, increases in wildfires, rising sea levels, and declining wildlife populations.

59.     If emissions continue to rise, climate change increasingly threatens the flooding of coastal cities, the mass extinction of plants and animals, the destabilization of governments, and refugee crises.

60.     The U.S. Government Accountability Office ("GAO") has recognized that federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others: "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."

61.     Western Colorado is particularly susceptible to the effects of climate change. The area is experiencing increasing temperatures and prolonged droughts. The impacts of these changes are widespread across our forests, wildlife, and human communities, threatening the area's resilience in the face of continued warming. These impacts also have significant importance to local economies that are reliant on consistent snowfall, not only for recreational pursuits within the planning area, but also for agricultural and residential water. Forty million

people downstream of the Colorado River rely on the River's water, a substantial amount of which is produced in the planning area.

62.     It is not too late for the United States government to take action to significantly lower the risk of much greater warming and climate disruption.

63.     The Secretary of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

64.     The GAO, in a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources,* concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

65.     Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change."

66.     There remains a fundamental disconnect with regard to how many of our public lands are managed for energy production, particularly in the West, including public lands in the Grand Junction Field Office, and national, state, and local policies to limit GHG emissions. Federal Defendants cannot take informed action to address climate change, as required by Order 3226 and Order 3289, without taking a hard look at the climate impacts of oil and gas development on our public lands. As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science."

67.     BLM is cognizant of the impacts of climate pollution, and acknowledges that "[c]oncentrations of greenhouse gases have increased dramatically in the earth's atmosphere in the past century. Anthropogenic (man-made) sources and human activities have been attributed to these increases particularly for carbon dioxide, methane, nitrous oxide, and fluorinated gases." BLM also acknowledges that "[a]s concentrations of these greenhouse gases increase, the earth's surface warms, the composition of the atmosphere changes, and global climate is affected."

68.     Yet, despite these acknowledgements, BLM fails to provide any analysis of climate change effects to resource values that RMP alternatives will contribute to, or mitigation measures to reduce these impacts. Instead, the EIS states that, "[p]otential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area."

69.     The White House Council on Environmental Quality ("CEQ"), the federal agency responsible for NEPA oversight, has recognized that:

[M]any agency NEPA analyses to date have concluded that GHG emissions from an individual agency action will have small, if any, potential climate change effects. Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations. This approach does not reveal anything beyond the nature of the climate change challenge itself: The fact that diverse individual sources of emissions each make relatively small additions to global atmospheric GHG concentrations that collectively have huge impact.

70.     BLM is responsible for the management of nearly 700 million acres of federal onshore subsurface minerals. The ultimate downstream GHG emissions from fossil fuel extraction of federally managed minerals by private leaseholders could account for approximately 23% of total United States GHG emissions and 27% of all energy-related GHG emissions. BLM must take a fact-based hard look at the GHG pollution implications of oil and gas development allowed by the Grand Junction RMP, as an incremental contribution to emissions from all BLM lands and from federal agency management decisions more broadly.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Failure to Take a Hard Look at the Indirect and Cumulative Impacts
of Combustion Emissions
(NEPA Violation)**

71.     Citizen Groups incorporate by reference all preceding paragraphs.

72.     NEPA requires a federal agency's EIS to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

73.     Agencies are required to take a hard look at the indirect impacts of a proposed action. 40 C.F.R. § 1502.16(b).

74.     BLM is required to provide a hard look analysis of these impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); see also 40 C.F.R. §§ 1501.2, 1502.5(a).

75.     "Indirect effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

76.     "Cumulative effects" are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

77.     In the Grand Junction RMP EIS, BLM quantified direct impacts from GHG emissions caused by foreseeable oil and gas production under the RMP. However, the Federal Defendants failed to address the foreseeable indirect impacts from the downstream combustion of the oil and gas resources leased and developed in the planning area.

78.     Additionally, the Grand Junction RMP EIS fails to take a hard look at the cumulative effects to the climate caused by foreseeable oil and gas production under the RMP in combination with the BLM's nationwide federal public lands oil and gas program, including by failing to evaluate the magnitude or severity of the increased emissions and the emissions caused

in total by BLM's nationwide federal public lands oil and gas program using existing tools such as the social cost of methane or carbon budgeting.

**79.**     Federal Defendants' failure to consider these impacts is arbitrary, capricious, an abuse of discretion, and contrary to NEPA, in 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. § 1508.8(b), and the APA, 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**Failure to Consider Alternatives to Oil and Gas Leasing and Development**
**(NEPA Violation)**

**80.**     Citizen Groups incorporate by reference all preceding paragraphs.

**81.**     An EIS must consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). NEPA further requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id*. § 4332(2)(E).

**82.**     Federal Defendants must "[r]igorously explore and objectively evaluate all reasonable alternatives" to their proposed action. 40 C.F.R. § 1502.14(a). This alternatives analysis is the "heart" of the EIS. *Id*. § 1502.14.

**83.**     In the Grand Junction RMP EIS, BLM failed to consider any alternatives that would meaningfully limit oil and gas leasing and development within the planning area and safeguard other multiple use values.

**84.**     BLM's failure to consider in the EIS a reasonable range of alternatives with respect to oil and gas leasing and development was arbitrary, capricious, and an abuse of discretion, contrary to NEPA, 42 U.S.C. § 4332(2)(C)(iii), (E) and its implementing regulations, 40 C.F.R. § 1502.14(a).

**REQUEST FOR RELIEF**

WHEREFORE, Citizen Groups respectfully request that this Court:

A.      Declare that Federal Defendants' actions violate NEPA and the regulations and policies promulgated thereunder;

B.      Vacate and set aside Federal Defendants' actions taken in reliance on the Grand Junction RMP EIS;

C.      Enjoin Federal Defendants from approving the leasing or development of oil and gas resources in the planning area pursuant to the Grand Junction RMP until Federal Defendants have demonstrated compliance with NEPA;

D.      Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein;

E.      Award Citizen Groups their fees, costs, and other expenses as provided by applicable law; and

F.      Issue such relief as Citizen Groups subsequently request and this Court may deem just, proper, and equitable.

Respectfully submitted this 8th day of October, 2019.

/s/ Kyle Tisdel
Kyle J. Tisdel (CO Bar No. 42098)
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602
Taos, New Mexico 87571
(p) 575.613.8050
tisdel@westernlaw.org

/s/ Julia Guarino
Julia K. Guarino (CO Bar No. 47252)
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602

Taos, New Mexico 87571
(p) 575.613.8050
guarino@westernlaw.org

*Counsel for Wilderness Workshop and The
Wilderness Society*

/s/ Peter Hart
Peter Hart (CO Bar No. 37832)
WILDERNESS WORKSHOP
P.O. Box 1442
Carbondale, CO 81623
(p): 970.963.3977 x12
peter@wildernessworkshop.org

*Counsel for Wilderness Workshop*

/s/ Diana Dascalu-Joffe
Diana Dascalu-Joffe (CO Bar No. 50444)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop St., Ste. 421
Denver, CO 80202
(p): 702.925.2521
ddascalujoffe@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

 I hereby certify that a copy of the foregoing PETITION FOR REVIEW was served on all counsel of record through the Court's ECF system on this 9th day of October 2019.


<u>/s/ Julia Guarino</u>